Vincent R. BARNETT, Plaintiff,

v.

**REVERE SMELTING & REFINING CORPORATION, Defendant.**

No. 98 Civ. 7307(CM).

United States District Court, S.D. New York.

Oct. 15, 1999.

Bernard Weinreb, Suffern, NY, for plaintiff.

Patrick McGinley, Finder and Cuomo, LLP, New York City, for defendant.

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiff Vincent Barnett was fired by Defendant Revere Smelting & Refining Corp. in November 1996. Barnett has brought claims against Revere for (1) termination in violation of the Family and Medical Leave Act, (2) termination in violation of the Americans with Disabilities Act and New York Human Rights Law, and (3) failure to accommodate his disability under the ADA and HRL. In addition, he has brought various tort claims, unrelated to his FMLA and ADA claims, against Revere for allegedly reporting falsely to Revere's workers compensation carrier that thumb and shoulder injuries suffered by Barnett did not occur on the job. Revere has moved for summary judgment on all of Barnett's claims pursuant to Fed.R.Civ.P. 56(c), and Barnett has cross-moved on his FMLA and ADA claims.

For the reasons discussed below, summary judgment is denied to both parties on Barnett's FMLA claim and termination claims under the ADA and HRL, and granted to Revere with respect to Barnett's failure to accommodate claim under the ADA and tort claims.

### Background

Barnett was hired by Revere in April 1989 to work in its refinery operation in Middletown. His duties included the removal of metals such as copper and nickel from molten metal in order to produce pure lead. Up until 1996, it seems that Barnett's performance history was quite positive—he was promoted to the position of refinery operator and received a $2,500 bonus for his good attendance record. After that point, however, Barnett was disciplined for a number of absences prior to his termination by way of verbal and written warnings, including several "Final Notice" warnings stating that any further absences would result in his termination.

In the spring of 1996, Barnett began to experience what he describes as chest pains, which Barnett claims caused him to become very tired, weak, and short of breath, and resulted in "an uncomfortable awareness of the heartbeat, palpitations accompanied by a pounding in the head, and dyspnea (air hunger resulting in labored or difficult breathing)." He contends that these symptoms were triggered by the "strenuous work" inherent in his job. Barnett consulted with Ann Sorino, the nurse at Revere's on-site medical unit, who in turn referred Barnett to Dr. Robert Kirschner, Revere's staff physician. Dr. Kirschner examined and ran an EKG on Barnett, both of which were inconclusive, and Kirschner referred Barnett to a cardiac specialist, Dr. Rajan Gulati, at Immediate Medical Care. On October 9, 1996, Rajan diagnosed Barnett with aortic regurgitation and mitral valve prolapse and placed Barnett on the prescription drug Procardia (Barnett stated at his deposition that his prescription has since been changed but was unable to recall the name of the new drug). Rajan also explained that it would take some time before the Procardia would take effect, but gave Barnett a return to work recommendation for

the following day. Barnett avers that even with the medication, he continues to suffer severe episodes of chest pain and labored breathing, requiring continued medical treatment.

After returning to work, Barnett related his diagnosis to his manager, Dan DeMercurio, and claims that he explained to DeMercurio that he might be unable to work from time to time as a result of his heart condition. DeMercurio then referred Barnett to Nurse Sorino for the purpose of scheduling an appointment with a doctor who could confirm Barnett's condition. Barnett then made an appointment with a Dr. Douglas for November 25. Barnett asserts that when he expressed concern about the disciplinary consequences of further absences caused by his condition, DeMercurio assured him that Revere would "work with him." DeMercurio testified that he merely told Barnett that each case would be dealt with individually.

Barnett further claims that after returning to work, he repeatedly asked to be transferred to less physically demanding positions, such as driving trucks, that existed at Revere. Revere refused all of his transfer requests.

On November 9, Barnett telephoned Revere's security guard (which Barnett claims is Revere's standard practice for calling in sick) and explained that he was suffering from chest pains and difficult breathing, and would not be working that day. His condition did not improve the next day and he again did not report for work. Upon his return to work on November 11, DeMercurio met with Barnett, along with Revere's head of human resources Lois Cronic and union steward Edwin Peet, in DeMercurio's office and informed Barnett that he was being terminated for excessive absenteeism. Revere claims that Barnett neglected to provide any documentation at this meeting as to his medical condition, while Barnett contends that both at and prior to the meeting he had shown DeMercurio a letter from Middletown Medical advising Barnett to see his physician regarding abnormal EKG results.

In April 1997, Barnett filed a complaint with the EEOC against Revere alleging that he was terminated in violation of the Americans with Disabilities Act ("ADA"). In July 1998, the EEOC dismissed his complaint, finding that Barnett had failed to show that he was disabled as defined by the ADA

*Workers Compensation Claims*

Barnett also claims that in December 1995 he injured his shoulder while working on the job, and that in July 1996, he injured the thumb on his left hand, also on the job. Barnett alleges that Revere challenged his eligibility for workers compensation benefits by falsely informing its workers compensation carrier that Barnett was not injured on the job. Barnett claims that as a result of the false information given the insurer by Revere, approval of Barnett's claims was delayed for more than two years, until approximately September 1998.

As a consequence of his joblessness after his termination from Revere and lack of workers compensation benefits, Barnett further alleges, he could not afford to treat his shoulder injury, which has become a permanent impairment. He also states that he is still awaiting a decision from the New York Workers' Compensation Board with respect to his thumb (as of the date of his complaint).

*Standards for Summary Judgment*

■ Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve

all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). For a plaintiff in a discrimination case to survive a motion for summary judgment, he or she must offer "concrete particulars" to substantiate the claim. *See Meiri v. Dacon,* 759 F.2d 989 (2d Cir.1985), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

*FMLA Claim*

■ Revere first argues that Barnett's FMLA claim fails because he has failed to make the required showing that his condition is covered by the Act.

The FMLA provides that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under ... subchapter [I of the Act]." 29 U.S.C. § 2615(a)(1) (1994). Barnett's claim falls under a provision of the FMLA that entitles an eligible employee to up to 12 weeks of unpaid leave during any 12–month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." § 2612(a)(1)(D). The Act defines "serious medical condition" as an "illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital ... or (B) continuing treatment by a health care provider." § 2611(11). As Barnett has never received inpatient care for his heart ailment, his condition can only fall under subsection (B) of this definition.

Department of Labor regulations provide guidance as to what constitutes a "serious health condition involving continuing treatment by a health care provider," listing several categories of such conditions. *See* 29 C.F.R. § 825.114(a). Revere cites only the second of these, which requires the inability to work for more than 3 consecutive days, and *either* medical treatment on 2 or more occasions, or medical treatment on one occasion resulting in a regimen of continuing treatment. *See* § 825.114(a)(2)(i)(A) and (B). As Revere points out, because Barnett was absent for only 2 days, he cannot rely on this definition. However, an alternative definition provided by § 825.114(a)(2)(iii) covers periods of incapacity due to a "chronic serious health condition." Such chronic serious health condition must require periodic visits to a health care provider for treatment, continue over an extended period of time, and cause episodic rather than a continuing period of incapacity. *See* § 825.114(a)(2)(iii)(A), (B), and (C). Here, Barnett avers that his condition requires periodic medical attention, will continue over time, and will cause him to miss work on occasion (Barnett Aff. ¶¶ 6, 8, 9). Revere has not offered any evidence to rebut this showing. Therefore, there exists at least a question of fact as to whether Barnett's condition satisfies the definitional requirements of the FMLA, and summary judgment for Revere on this ground is denied.

■ Revere argues incorrectly that a FMLA plaintiff suing on the basis of continuing treatment must make a showing under § 825.114(a)(2)(i) of the Regulation that he or she was absent from work for more than three days *in addition* to meeting the "chronic serious health condition" definition of subsection (iii) upon which Barnett relies. In support of this proposition Revere cites *Roberts v. Human Development Assoc.,* 4 F.Supp.2d 154 (E.D.N.Y. 1998), a case involving an employee who suffered from a single episode of postmenopausal vaginal bleeding. Because the *Roberts* Court found that the condition at issue did not amount to a "chronic serious health condition" under the FMLA, it did not have occasion to consider the alterna-

tive showing provided under subsection (iii), and the case is therefore inapposite. In any event, Revere's error is self-evident upon a reading of § 825.114(a)(2), which states that a serious health condition involving continuing treatment includes "any one of the following" subsections, which consist of (i) through (v), including the above-described definition under subsection (iii), which applies to this case. Moreover, § 825.114(e) specifically provides that absences under subsections (ii) and (iii) may qualify for FMLA leave "even if the absence does not last more than three days."

■ Revere argues next that Barnett failed to meet the FMLA's requirement of notice to an employer of the employee's need for FMLA leave. The Act requires that an employee provide an employer with at least 30 days notice of the necessity for leave in cases where "the necessity for leave is foreseeable." 29 U.S.C. § 2612(e)(1). Revere does not dispute that Barnett's need for medical leave was unforeseeable, and the FMLA is silent as to notice requirements in such cases. However, the issue is addressed by the Regulations, which provide that in such cases, "an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case."[1] 29 C.F.R. § 825.303(a). The employee "need not expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice, though the employee would need to state a qualifying reason for the needed leave." § 825.208(a)(2).

■ Once an employee provides sufficient notice, the employer is on inquiry notice and bears the burden of ascertaining further details to determine whether the leave qualifies for FMLA protection. See § 825.302(b); *Price v. City of Fort*

*Wayne*, 117 F.3d 1022, 1026 (7th Cir.1997). The FMLA "does not require that an employee give notice of a desire to invoke the FMLA. Rather it requires that the employee give notice of need for FMLA leave. This kind of notice is given when the employee requests leave for a covered reason. After a notice of this sort the employer can inquire further to determine if the FMLA applies." *Price*, 117 F.3d at 1026. The activation of this duty of inquiry requires the employer to "inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken." § 825.302(c).

Revere argues that Barnett's phone calls to its security guard on November 9 and 10 failed to meet this requirement, reasoning that Revere could not have discerned from the information transmitted by Barnett to the guard that Barnett's absence from work was attributable to his heart condition, and thus covered by the FMLA. Barnett responds that his prior discussions with DeMercurio and Nurse Sorino adequately apprised Revere of his heart condition, such that his phone call afforded adequate notice that he required FMLA leave.

■ In determining whether adequate notice of the need for FMLA leave was given to an employer, "[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir.1995). "While an employer's duty to inquire may be predicated on statements made by the employee, the employer is not required to be clairvoyant." *Johnson v. Primerica*, No. 94 Civ. 4869, 1996 WL 34148, *5 (S.D.N.Y. Jan.30, 1996). An employer's duty to conduct further inquiry into a re-

---

1. The Regulation goes on to note that "[i]t is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave." *Id.* Whether Barnett complied with this requirement turns, obviously, upon whether Barnett gave Revere adequate "notice" within the meaning of the FMLA.

quest for leave "is first triggered when an employee gives sufficient notice of a medical need for the requested leave." *Id.* at *6.

Because Barnett did not refer to his aortic regurgitation and mitral valve prolapse specifically when he called in sick, the key question in this case is the extent to which Revere's awareness of Barnett's condition before November 11 should have put it on notice that Barnett's November 9 and 10 absences were related to his heart condition. The parties' testimony differs on this point. Although he never referred to his aortic regurgitation or mitral valve prolapse by name, Barnett testified that he showed Nurse Sorino his Procardia prescription, that he had mentioned his chest pains to DeMercurio and Peet on several occasions, and that he told DeMercurio that he had been diagnosed with a "serious heart condition" (Barnett Dep. at 37–38, 40, 50; Barnett Aff. ¶ 9). DeMercurio testified that Barnett had complained to him about a heart condition, but that Nurse Sorino had told him that Barnett's doctors had found no problem (DeMercurio Dep. at 13–14, 16).

There is authority supporting Barnett's argument that the facts of this case meet the *Westlake* standard. In *Ware v. Stahl Specialty Co.*, No. 97–0436–CV–W–6, 1998 WL 184267 (W.D.Mo. Apr.9, 1998), the plaintiff had informed his supervisor and the company physician upon starting employment that he suffered from severe migraine headaches. The plaintiff missed work on 5 occasions, each time calling into work and explaining only that he was "sick" or had a "headache," and after most of those absences, stating on an employee request form that he had missed work due to "migraine attack."

Though agreeing with the defendant's argument that reporting "sickness" or a "headache," without more, is insufficient notice under the FMLA, the Court determined that all of the facts and circumstances surrounding the plaintiff's request for time off were to be considered. In denying summary judgment for the employer, the Court concluded that the employer had sufficient information about the plaintiff's condition to give it adequate notice that the plaintiff's absences were related to his ailment, and thus qualified for treatment under the FMLA. *See id.* at *5.

The facts of *Ware* are analogous to those here, viewed in the light most favorable to Barnett. Although the cases are distinguishable insofar as the plaintiff in *Ware* referred specifically to his condition, rather than only to its symptoms, in this case, both Barnett's supervisor and the company nurse were at least aware of recurring symptoms that suggested a potentially serious condition, though the parties dispute whether the full extent of Barnett's diagnosis was ever made known to them. Barnett testified that he told Nurse Sorino sometime in 1996 that he was having chest pains (Barnett Dep. at 23); that he told DeMercurio in early November that his chest pains were getting worse (*Id.* at 31); that he was taking "medication" for his chest pains (*Id.* at 51); that he told DeMercurio that he had been diagnosed with a "serious heart condition" and that he might occasionally be unable to work (Barnett Aff. ¶ 9); that he showed Nurse Sorino his Procardia pills and asked her whether it was safe for him to work on the smelting floor while taking them (*Id.* at 37–38); that he showed DeMercurio a letter dated October 25, 1996 from Middletown Medical advising him to see his doctor regarding his abnormal EKG results; and that on the morning of November 9, when he called in sick, he told the guard that he was "having some chest pains" and found it "hard to breathe" (*Id.* at 34).

Barnett further testified that before November 9, DeMercurio told him to see another doctor (presumably to confirm his condition for Revere), and that he made an appointment for November 25. He soon thereafter met with DeMercurio and Peet to discuss his condition, and during that meeting, according to Barnett, he expressed his concern to DeMercurio that

his condition might cause him to miss work again, and feared potential disciplinary action by Revere for any further absences. Barnett claims that DeMercurio assured him that "if something happens, the company will work with you"[2] (*Id.* at 52).

DeMercurio acknowledges that Barnett had spoken to him about his symptoms and told him that he had sought medical attention:

Q. Did Vince ever complain to you about a heart problem?

A. The prior absence to his termination absences he said he had a heart problem, chest pain . . . [W]hen he was given his final warning . . . it was brought up that he had chest problems, heart problems, pain in his chest (DeMercurio Dep. at 12).

But DeMercurio further testified that Nurse Sorino had informed him that the report from Barnett's physical gave no indication of heart problems (*Id.* at 13, 16), and that he was unaware that Barnett's absences on November 9 and 10 were related to his heart problem:

Q. But you know that [the November 9 and 10] absences were based on [Barnett's] heart?

A. No, I did not. When he called in sick—when he called in, he just called in sick. Actually, I think he said he may be in later in the day (*Id.* at 13).

In light of the conflicting testimony, there is a question of fact as to whether Barnett's prior conversations about his condition with DeMercurio and Nurse Sorino, coupled with his phone call to Revere's security guard on the mornings of November 9 and 10, should have given Revere reason to conclude that his absence was due to his "serious health condition" under the FMLA.[3] *See also Hendry v. GTE North, Inc.*, 896 F.Supp. 816, 828 (N.D.Ind. 1995) (issues of fact as to adequacy of notice under FMLA precluded summary judgment where employer knew plaintiff suffered from migraine headaches and she told employer that she was suffering a migraine episode when calling in sick); *c.f. Price*, 117 F.3d at 1025 (denying summary judgment on grounds of insufficient notice under FMLA where employee wrote "medical need" on leave request form and attached doctor's note; employer was under duty to inquire as to further details of FMLA applicability). Summary judgment

**2.** DeMercurio testified that he merely told Barnett that "every absence is dealt with individually, and we'll review the circumstances surrounding it and decide what disciplinary action would be taken at that point" (DeMercurio Dep. at 16–17).

**3.** Revere attempts to liken the facts of this case to those in *Johnson, supra.* In that case, the plaintiff made a written request for leave based on "a matter [ ] of significant financial importance to [plaintiff's] family," but alleged that his employer knew that his request for leave was due to his son's illness because he had "intimated" to his supervisor that his son was ill at the time he requested leave. However, the plaintiff was unable to recall what he said that would have triggered his son's illness in his supervisor's mind. In finding this to be insufficient notice, Magistrate Judge Ellis observed that the FMLA "would not be triggered unless [plaintiff] could show that [the supervisor] understood his oblique references." The plaintiff further argued that his employer had prior knowledge of his son's condition based on the fact that he told his supervisor after an earlier absence that his son had been "sick", that a former supervisor had expressed sympathy for his son's condition, and that he had been given two-week leave before for what he "think[s] were reasons related to his son's illness." *See id.* at *5–*6. These were all found to be insufficient to put the employer on notice.

The present case is plainly distinguishable. In *Johnson*, even crediting the plaintiff's testimony, the employer's prior knowledge was based on a few vague statements referring to his son's "sickness" or "illness" that were remote in time from the plaintiff's request for leave. In other words, there was no logical nexus between what the employer knew about his son's illness and his written request for leave. In this case, by contrast, Barnett testified that he made several references to specific symptoms—chest pains and labored breathing—during the weeks immediately leading up to the November 9 and 10 absences, and that he described those same symptoms in his message to Revere's security guard on the morning of November 9.

is therefore unavailable to either party on the basis of inadequate prior notice to Revere.

■ Barnett further argues that he gave adequate notice of his need for FMLA leave upon his return to work on November 11. Section 825.208(e)(1) of the Regulations provides an alternate means for giving notice where the employee is absent for an FLMA reason, but the employer "did not learn the reason until after the employee's return (e.g., where the employee was absent for only a brief period)." The subsection goes on to provide in pertinent part:

> If leave is taken for an FMLA reason but the employer was not aware of the reason, and the employee desires that the leave be counted as FMLA leave, the employee must notify the employer within two business days of returning to work of the reason for the leave. *In the absence of such timely notification by the employee, the employee may not subsequently assert FMLA protections for the absence* (emphasis added).

In this case, Barnett claims that he gave timely notification of his need for FMLA leave at the November 11 meeting with DeMercurio, Cronic, and Peet at which he was fired:

> A. [DeMercurio] says "You didn't come to work yesterday and Saturday" ... So I said "It was just recently we had this conversation. I told you I'm having this problem ... You know chest pain doesn't come with invitation. It doesn't know when it's coming. You even said don't go and see your doctor that you were going to see" (Barnett Dep. at 63–64).

Barnett also claims that he showed DeMercurio the October 25 letter from Middletown Medical (discussed on page 5) at the meeting (Barnett Aff. ¶ 14). DeMercurio

denies that Barnett ever brought him a doctor's note related to his heart condition (DeMercurio Dep. at 20), and, oddly, Barnett's lawyer did not elicit any further testimony as to what Barnett represented to him at the November 11 meeting.

Barnett's allusion at that meeting to "chest pain," and his alleged production of a letter reporting an abnormal EKG result do no more than his prior communications with Revere to clarify the extent of Revere's knowledge as to whether his November 9 and 10 absences were related to his FMLA condition. Summary judgment on Barnett's FMLA claim on this ground as well is denied to both parties.

■ Finally, in what appears to be an attempt to demonstrate a lack of discrimination, Revere points out that Barnett's termination was based on "excessive absenteeism," including nine unexcused absences prior to those on November 9 and 10, most of which were unrelated to his heart condition. Nevertheless, a termination based only in part on an absence covered by the FMLA, even in combination with other absences, may still violate the FMLA. *See Monica v. Nalco Chemical Co.,* No. Civ. A 96–1286, 1996 WL 736946, *2 (E.D.La. Dec.26, 1996).

*Disability Claims*

■ Barnett alleges that he was terminated as a result of his heart condition in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (1994), and the New York State Human Rights Law ("HRL"), N.Y.Exec.Law § 296 (McKinney 1993 and Supp.1998). With respect to Barnett's termination, analysis of his claims under the ADA and HRL is identical.[4] *See Mohamed v. Marriott Int'l,* 905 F.Supp. 141, 156 (S.D.N.Y.1995).

---

4. The Second Circuit has recognized that the HRL provides a broader definition of "disability" than the ADA. *See Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 154–56 (2d Cir.1998). However, because

Barnett has made a sufficient showing to satisfy the more stringent definition under the ADA, *see infra,* there is no need to consider this distinction between the two statutes for the purposes of this case.

The ADA provides that "[n]o [employer covered by the Act] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

■ Claims brought under the ADA in this circuit are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir.1998). Under the *McDonnell Douglas* approach, the plaintiff must initially come forward with facts sufficient to establish a prima facie case that the adverse employment act was carried out under circumstances giving rise to an inference of discrimination. If established, the prima facie case creates a rebuttable presumption of unlawful discrimination by the employer. The burden of production then shifts to the employer, who must articulate a legitimate, nondiscriminatory reason for its actions. If the employer does so, the presumption of discrimination is rebutted. Plaintiff must then prove by a preponderance of the evidence that the defendant's proffered explanation was not its real reason, but a pretext for discrimination. *See id.* at 52.

■ In order to make out a prima facie case of discriminatory discharge under the ADA, a plaintiff must show that (1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the ADA; (3) he could perform the essential functions of the job with or without reasonable accommodation; and (4) he was fired because of his disability. *See Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144 (2d Cir.1998).

■ Neither party disputes that Revere is an employer covered by the Act. However, Revere argues that Barnett's heart condition cannot be characterized as a disability under the Act. The ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment. § 12102(2).

According to the governing EEOC regulations, an individual is "substantially limited if he or she is '[u]nable to perform a major life activity that the average person in the general population can perform' or '[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity' " as compared to the average person in the general population. 29 C.F.R. § 1630.2(j)(I)–(ii). "Major life activities" are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." § 1630.2(I). In this case, Barnett asserts that his heart condition substantially limits his major life activity of breathing.

The three factors to be taken into account in the determination of whether an impairment substantially limits a major life activity are: (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long-term impact of or resulting from the impairment. *See* § 1630.20(j)(2)(I)–(iii). Barnett has stated that he continues to have severe attacks of chest pains and labored breathing, and may continue to have such attacks in the future (Barnett Aff. ¶¶ 7A, 9).

■ In support of its contention that Barnett's condition does not satisfy the statutory definition, Revere cites the recent Supreme Court companion cases *Murphy v. United Parcel Serv., Inc.,* —— U.S. ——, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) and *Sutton v. United Air Lines, Inc.,* —— U.S. ——, 119 S.Ct. 2139, 144

L.Ed.2d 450 (1999).[5] In *Murphy* and *Sutton*, the Court held that the determination of whether an individual is "disabled" within the usage of the ADA is to be made with reference to the effect of corrective measures. *See Murphy*, —— U.S. at ——, 119 S.Ct. at 2137; *Sutton*, —— U.S. at ——, 119 S.Ct. at 2149. In other words, a physical impairment that would be otherwise be classified as a disability in its uncorrected state cannot be so deemed if, with aid of corrective measures, the impairment does not substantially limit a major life activity.

Revere argues that under this rule, given Barnett's admission that his medication alleviates the symptoms of his condition to the extent that he is able to perform his job duties with only minor interruption (Barnett Dep. at 38, 48–49), he cannot be considered "disabled" under *Murphy* and *Sutton*.[6] Barnett responds that those cases are factually distinguishable because they involved plaintiffs whose conditions— high blood pressure and myopia respectively—were *immediately* correctable, whereas Barnett's symptoms could only be mitigated over an extended period of time.

■ Barnett is correct that *Murphy* and *Sutton* are distinguishable from the present case, but not for the reason that he asserts. Neither of the former cases stands for the proposition that application of the rule they announced is contingent upon the immediacy of a mitigating measure's effectiveness. To the contrary, the

*Murphy* Court emphasized that the question of whether the petitioner qualified as disabled having begun taking his blood pressure medication was not before it, and as such, it had "no occasion to consider whether petitioner is 'disabled' due to limitations that persist despite his medication or the negative side effects of his medication." *Murphy*, —— U.S. at ——, 119 S.Ct. at 2137. The critical inquiry, therefore, is not whether a corrective measure takes immediate effect, but whether the individual's life activity remains substantially limited once the corrective measure is implemented.

Under this standard, Revere's argument that Barnett's medication precludes a finding that Barnett has a disability must fail. Revere cites Barnett's testimony that Barnett's only limitations on the job before taking Procardia were occasional chest pains and labored breathing that he was able to deal with by simply stepping outside and using his respirator for a few minutes (Barnett Dep. at 40, 54). However, Barnett has stated that he continues to suffer episodes of chest pain and breathing difficulty as a result of his aortic regurgitation and mitral valve prolapse, and that his condition may cause him to miss work on occasion in the future (Barnett Aff. ¶¶ 7A–9). Because there exists a factual question as to the extent to which Barnett's physical limitations persist despite his medication, the facts of this case lie beyond the reach of *Murphy* and *Sutton*.[7]

---

5. As Revere points out, EEOC findings can be significant, probative evidence in a factual determination of discrimination. *See Strauss v. Microsoft Corp.*, 91 Civ. 5928, 1995 WL 326492, *3 (S.D.N.Y.1995). However, they are also not binding on the Court, *see id.*, and because I do not read *Murphy* and *Sutton* as foreclosing a finding that Barnett was disabled, I cannot agree with its finding in this case.

6. Barnett testified: "If I was on the floor and I get these pains I would walk off the floor, get in the washroom; wash up, my hands and face; take my shirt off; go in to get a clean shirt from the locker room; get the respirator; walk outside and get fresh air. I would

sit outside and it would go away and then I'd go back to work" (Barnett Dep. at 40).

7. Revere makes much of Barnett's admission in his complaint that "[a]s a result of the medication [he was taking] he was capable of performing his job at the time he was terminated from employment" (Barnett Complaint ¶¶ 32, 49), arguing that Barnett cannot simultaneously claim that he is disabled and that he is capable of performing his job. In his brief and affidavit, Barnett, rather conveniently, asserts in response that his medication, as his doctor predicted, did not take effect until after Barnett was fired, so that he continued to suffer from a "disability" as of

■ The third element of a prima facie claim under the ADA requires Barnett to show that he was qualified to perform the essential functions of his job with or without reasonable accommodation. Revere cites Barnett's admission that his condition may cause him to miss work on an occasional basis in the future, and argues that his prospective absenteeism precludes him from being considered qualified to perform his job functions. "Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee 'who does not come to work cannot perform any of his job functions, essential or otherwise.'" *Tyndall v. Nat'l Educ. Centers, Inc. of California,* 31 F.3d 209, 213 (4th Cir.1994) (quoting *Wimbley v. Bolger,* 642 F.Supp. 481, 485 (W.D.Tenn. 1986), *aff'd,* 831 F.2d 298 (6th Cir.1987)). Several circuits and district courts within this circuit, have held similarly. *See, e.g., Nowak v. St. Rita High School,* 142 F.3d 999, 1002–04 (7th Cir.1998) (teacher who was absent for 18 months prior to termination was not "qualified individual" under ADA); *Nesser v. Trans World Airlines, Inc.,* 160 F.3d 442, 445–46 (8th Cir.1998) (airline sales agent not otherwise qualified under ADA where he missed 175 workdays in the year prior to his termination); *Carr v. Reno,* 23 F.3d 525, 529–30 (D.C.Cir. 1994) (coding clerk at U.S. attorney's office not otherwise qualified under Rehabilitation Act where she missed over 460 hours of work in year prior to dismissal); *Bobrowsky v. New York City Bd. of Educ.,* No. 97CV874, 1999 WL 737919 (E.D.N.Y. Sep. 16, 1999) (teacher who took 17 absences during school year not otherwise qualified under ADA); *Daddazio v. Kath-*

*erine Gibbs School, Inc.,* No. 98 Civ. 6861, 1999 WL 228344 (S.D.N.Y. Apr.20, 1999) (plaintiff who told employer that he would be incapacitated for "indefinite period of time" after being hospitalized not otherwise qualified).

As Barnett notes, however, cases such as those cited above involved plaintiffs with far longer periods of absence that could only be found by a reasonable factfinder to have impeded their ability to effectively perform their essential job functions. In the present case, by contrast, Barnett was absent only nine times during a span of one year, and he has stated that at the time of his discharge he was capable of performing his job "on most days" (Barnett Aff. ¶ 16). Revere has produced no evidence indicating that Barnett's past or future need to be absent from work on an occasional basis will make it impossible for him to perform the essential functions of his particular job. Absent such a showing, there is a question of fact as to whether Barnett is otherwise qualified, and his absenteeism cannot be a basis for summary judgment.

■ Barnett is next required to demonstrate that Revere fired him because of his disability. To defeat Revere's motion for summary judgment, Barnett must produce sufficient evidence to support a rational finding that the reasons proffered by Revere were false, and that more likely than not, his disability was the real reason for his discharge. *See Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2d Cir.1994) (citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407). In cases such as the

---

his termination date (Barnett Aff. ¶¶ 9, 17; Plaintiff's Brief at 16).

Whether or not Barnett's response is credible is beside the point. An individual may be "disabled" for ADA purposes and at the same time be capable of carrying out his or her employment duties. Indeed, the Act itself defines a "qualified individual with a disability" as an "individual *with a disability* who, with or without reasonable accommodation" can perform the essential functions of the posi-

tion. 42 U.S.C. § 12111(8) (emphasis added). The rule suggested by Revere would render it impossible for an ADA plaintiff to make the necessary showing that he or she is "otherwise qualified" for a position, because the plaintiff would be forced to admit, in essence, that he or she is incapable of performing it. Again, the proper focus is whether a major life activity of Barnett was impaired at the time of his termination, not whether he was able to do his job.

present one, where the plaintiff's case in entirely circumstantial, "the pertinent question is whether plaintiff's main case contains evidence sufficient to permit the trier of fact to draw an inference that the prohibited motive was a substantial factor in the adverse employment decision." *Burger v. New York Institute of Technology,* 94 F.3d 830, 833 (2d Cir.1996). At a minimum, for there to be causation, the employer must have knowledge of the disability. *See Hedberg v. Indiana Bell Telephone Co.,* 47 F.3d 928, 931–34 (7th Cir. 1995).

■ As discussed above, there is a question of fact as to whether Revere knew of Barnett's condition at the time it terminated Barnett. Moreover, where an employer asserts excessive absenteeism as a non-discriminatory justification for an employee's termination, that justification cannot analytically be considered apart from the alleged disability causing the absenteeism. *See Teahan v. Metro–North Commuter R.R. Co.,* 951 F.2d 511, 516 (2d Cir.1991) (denying summary judgment on Rehabilitation Act claim on ground that question of fact existed as to whether employee's absenteeism was caused by his handicap). Because an issue of fact exists as to whether Barnett's absenteeism resulted from his heart condition, Barnett has produced sufficient evidence from which a jury could conclude that Revere's proffered motive was pretextual.

The Second Circuit has instructed that with respect to discrimination cases, trial courts are to be cautious about granting summary judgment to an employer where, as in this case, the employer's intent is at issue. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994). With this guideline in mind, I deny Revere's motion to dismiss this claim, as Barnett has made an adequate showing upon which a reasonable finder of fact could infer that Barnett's discharge was motivated by an intent to discriminate him based on his heart condition.

■ The same cannot be said of Barnett's claim against Revere for failure to accommodate his disability. The term "discriminate," as used in the ADA, includes "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability." 42 U.S.C. § 12112(b)(3)(A). This may include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." § 12112(b)(5)(A). The plaintiff bears the burden of showing that a reasonable accommodation exists, *see Stone v. City of Mount Vernon,* 118 F.3d 92, 98 (2d Cir. 1997), although this burden is not an exacting one. *See id.* It is sufficient for a plaintiff to suggest the existence of a plausible accommodation, the costs of which do not facially exceed its benefits. *See id.*

■ On this issue, Barnett has come nowhere near to meeting his burden. In his Affidavit, Barnett states that he told DeMercurio and Peet of his desire to transfer to less strenuous positions prior to his termination. However, he points to no evidence whatsoever suggesting that such positions were available, or challenging the testimony of both DeMercurio and Peet that there were no less physically demanding jobs open at Revere during the time in which Barnett sought transfer (DeMercurio Dep. at 22–24; Peet Depo. at 20). Nor has Barnett made any showing whatsoever as to the relative costs and benefits of his proposed accommodation. Rather, Barnett makes the bare assertion in his Affidavit that "Revere failed to accommodate me even though it was aware that I had difficulties performing the job I was doing at the time as a result of my disability" (Barnett Aff. ¶ 21). However, knowledge by the employer, without more, of an employee's disability, does not give rise to a duty on the part of the employer to transfer the employee to the employee's desired position. The plaintiff is required to establish that such a position existed, and that such accommodation is reason-

able. *See Quintana v. Sound Distribution Corp.,* No. 95 Civ. 0309, 1997 WL 40866, *6 (S.D.N.Y. Feb.3, 1997) (summary judgment for employer due in part to plaintiff's failure show that alternative position was reasonable or vacant). Barnett has satisfied none of these elements.[8] Revere's motion with respect to his failure to accommodate claim is therefore granted.

Finally, apart from his evidentiary shortcomings, Barnett has no accommodation claim under the Human Rights Law. Unlike the ADA, the HRL did not impose upon private employers the duty to "reasonably accommodate" an employee's disability until January 1, 1998, when Section 296 was amended to cover this type of discrimination. *See Muszak v. Sears, Roebuck & Co.,* 63 F.Supp.2d 292, 299 (W.D.N.Y. 1999); *Hendler v. Intelecom USA, Inc.,* 963 F.Supp. 200, 211 (E.D.N.Y. 1997). Because Revere's alleged failure to accommodate Barnett's disability took place before this date, he cannot avail himself of the HRL on this claim. *See Muszak* 63 F.Supp.2d at 299.

*Tort Claims*

Barnett has also brought various tort claims, including negligence, interference with contract, and fraud, arising out of Revere's allegedly false report to Revere's workers comp carrier that Barnett's shoulder and thumb injuries did not occur while Barnett was on the job.[9] These claims are easily disposed of, as Barnett has failed to provide evidence sufficient to support any of them. In fact, Barnett appears to admit as much in his Brief, where he enumerates the elements of interference with contract and fraud claims in New York, adding after both,

"Plaintiff must, and will, establish all these facts by a preponderance of the evidence" (Plaintiff's Brief at 20, 21). Unfortunately for Barnett, a pledge to make the required showing is insufficient to withstand a summary judgment motion.

The only evidence to which Barnett points in support of his tort claims is a portion of the testimony of Marvin Taylor, a former roommate of Barnett who served as the "lead man"—a type of peer intermediary between the workers and management at Revere—at the time of Barnett's injuries. Specifically, Taylor describes a conversation between himself and Barnett in which Barnett described an attempt by Lois Cronic and Nurse Sorino to force Barnett to submit his insurance claim for his shoulder injury as a disability claim, rather than as a workers compensation claim:

Q. Do you know whether Vince [Barnett] was asked to sign a note relating to his shoulder injury indicating that the injury did not occur on the job?

A. Yes.

Q. What can you tell me about this note, what happened?

A. Vince Barnett told me that he went into the office with the shop steward with the note from his doctor saying that the injury he had resulted from being work related. But the regular shop steward couldn't get nowhere, so that's when he came to me.

When he came to me, I went into the personnel office, Lois [Cronic], she's the personnel office, and we talked to her ... She said we could sign a disability

---

**8.** It is also noteworthy that Barnett has not even made a clear assertion that he requires accommodation at all. Although he asserts that the strenuous nature of his former position at Revere exacerbated his symptoms (Barnett Aff. ¶¶ 6, 19, 20), he also admits that he was capable of performing his job on most days (*See id.* ¶ 16).

**9.** Barnett articulated the latter two theories for the first time in its Brief. He argues that

it is permissible for his to do so because he has satisfied the notice pleading requirements of Fed.R.Civ.P. 8, apparently overlooking the fact that the heightened pleading requirements of Rule 9 would be applicable to his fraud claim. There is no need to reach the issue because, as discussed *infra,* Barnett has failed to produce evidence to support any of these claims.

note. But I told her "It's not a disability claim, it's a compensation claim because it happened on the job." Once we told her that, she said you have to go to the nurse's office and talk to the nurse about it.

When we went to the nurse's office, I explained the same thing, that Lois sent us to her because Lois was saying it was disability and I told her it's not.

And Mr. Barnett showed me a statement he got from the doctor stating it was job related. Then there was a note written on there with an ink pen saying it's not job related.

I said "Who wrote this?"

He said "The nurse wrote it."

That's what he told me, because it was written in ink. It was a printout from a computer.

I said, "Why did the nurse write it on there?"

He told me he don't know why (Taylor Dep. at 9–11).

■■■ This account consists almost entirely of out of court statements relevant only for their truth. A party cannot rely on inadmissible hearsay in opposing a motion for summary judgment absent a showing that admissible evidence will be available at trial. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir.1985). Barnett has made no such showing. Indeed, he has not even produced the doctor's note to which Taylor referred. Moreover, even assuming that this testimony is admissible, the conversation Taylor describes does nothing to establish intentionally, let alone negligently, tortious conduct on the part of Revere in processing Barnett's workers compensation claim for his shoulder injury. Accordingly, Barnett's tort claims are dismissed.

*Conclusion*

Because questions of fact remain with respect to Barnett's FMLA claim and his termination claim under the ADA and NYHRL, Revere's motion for summary judgment on those claims is denied. Revere's motion is granted with regard to Barnett's accommodation claim under the ADA as well as Barnett's tort claims.

This constitutes the decision and order of the Court.